Stanley L. SHARP et al.

v.

COOPERS & LYBRAND.

Civ. A. No. 75–1313.

United States District Court,
E. D. Pennsylvania.

June 26, 1979.

Theodore R. Mann, Larry H. Spector, Philadelphia, Pa., for plaintiffs.

Matthew J. Broderick, John E. Flaherty, Jr., Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

This is a securities fraud class action in which the issue of the defendant's liability has already been tried before a jury and determined in the plaintiffs' favor; the plaintiffs' individual claims for damages remain to be tried. The facts of the case are set forth in our September 27, 1978 opinion disposing of the post-trial motions[1] and will not be repeated here except as necessary. Now before us is the defendant's Rule 37 motion to compel discovery relating to the issues remaining to be tried.[2] Before we can decide this motion, however, it is necessary for us to resolve two preliminary matters: the scope of the class of investors now entitled to pursue their individual claims for damages, and the proper method for measuring those damages.

### I. THE CLASS OF INVESTORS NOW ENTITLED TO PURSUE INDIVIDUAL CLAIMS FOR DAMAGES

We originally certified a class consisting of all investors who, on or after July 22, 1971, purchased the securities involved in this litigation. 70 F.R.D. 544 (E.D.Pa.1976). On that date, the defendant wrote the first of two opinion letters relevant to this case; the second was written on October 11, 1971.[3]

The jury found that the October 11 letter contained both material misrepresentations and material omissions, and that Herman Higgins, the defendant's employee who wrote the letter, acted either recklessly or with intent to defraud in preparing that letter. The jury also found that the July 22 letter did not contain material misrepresentations or omissions. We therefore stated, in our September 27, 1978 opinion, although this matter was not briefed or raised, that "liability can arise only from reliance on the October 11 letter." 457 F.Supp. at 884. The plaintiffs have now argued, and we are persuaded, that those investors who purchased their securities *after* October 11, 1971 in reliance on *either* opinion letter may pursue their claims for damages. Careful analysis of the evidence presented at trial and of the jury's verdict compels this decision.

The plaintiffs' evidence, offered to prove that *both* opinion letters were fraudulent, fell into three categories. *First,* the plaintiffs offered expert testimony that the letters were written recklessly because they failed to state certain material facts concerning the non-recourse loan which the letter assumed lending institutions would make to Westland Minerals Corporation (WMC), the general partner and promoter of the venture in which the plaintiffs had invested. *Second,* the plaintiffs introduced evidence which showed that by October 11, 1971, Higgins had acquired certain knowledge of a fraudulent loan scheme entered into by WMC. The plaintiffs' expert testified that if Higgins had written the opinion letters with this knowledge, then they contained a number of material misrepresentations. *Third,* the plaintiffs established that by October 11, 1971, Higgins was working closely with Economic Concepts, Inc. (ECI), the selling agent for WMC. According to the plaintiffs' expert, Higgins' failure to disclose this relationship in his tax opinion letters was a material omission.

---

1. 457 F.Supp. 879 (E.D.Pa.1978).

2. *E. g.,* reliance on the defendant's opinion, due diligence in discovering the fraud, and the running of the statute of limitations.

3. The letters are appended to this opinion.

■ There is no question that the October 11 letter is nearly a verbatim copy of the July 22 letter, with the addition of two final paragraphs not relevant to the fraud which was perpetrated in this case. Thus, it is clear that the jury's finding that the October 11 letter contained material misrepresentations and omissions could not have been based on the first category of evidence (*see supra*), for *both* letters were identical in this respect. Therefore, the only rational explanation for the jury's verdict is that it was based upon the evidence concerning Higgins' knowledge of WMC's fraud and his connection with ECI, and that the jury found that Higgins acquired this knowledge and began working for ECI *after* July 22 but before October 11. In essence, the jury's verdict represents a finding that the July 22 letter did not contain material misrepresentations or omissions *when written*, but that the *same letter* became fraudulent by October 11 due to information acquired by the author between those two dates.[4] In other words, the requisite scienter for § 10(b) liability was missing on July 22, but was acquired by October 11.

The plaintiffs argue that reliance by an investor on the July 22 letter after October 11 should create liability, for after the latter date the author of the July 22 letter either knew it to be false or acted in reckless disregard of the truth. Given such knowledge, or reckless conduct, the author (and therefore the defendant) should be liable for a breach of the duty to correct, after October 11, what had *become* a fraudulent opinion letter. This duty to correct a previously truthful but now fraudulent opinion arises from § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. The purpose of that statute, and the Rule promulgated thereunder, is to protect purchasers and sellers of securities from "*any* device, scheme, or artifice to defraud. . ." Rule 10b–5(a) (emphasis added). As has been recognized, "[f]raud may be accomplished [not only] by false statements, [but also by] a failure to correct a misleading impression left by statements already made . . . ." *Cochran v. Channing Corp.*, 211 F.Supp. 239, 243 (S.D.N.Y.1962).

The duty to correct a previously truthful but now false opinion was recognized in *Thomas v. Duralite Company, Inc.*, 386 F.Supp. 698 (D.N.J.1974), aff'd as to liability, rev'd and remanded as to damages, 524 F.2d 577 (3d Cir. 1975). In imposing 10b–5 liability, the district court in that case stated that

"The simple fact is that Thomas was induced by Lesser in January of 1968 to believe that his stock in Duralite was worthless, and worse still, that Thomas' position in Duralite had been transformed into a holding which, by reason of his personal loan and his company's (Edco.) indebtedness, could be momentarily translated into a liability. This information, the evidence indicates, was accurate and truthful when Lesser gave it in January of 1968. It certainly was *no longer accurate* when Lesser, Thomas and Edwards met in April, and as of June 18, 1968, when the contract of sale was made, it was totally false. Yet Thomas sold his stock on the basis of the representation that Duralite still hovered on the edge of bankruptcy, and Lesser *stood by silently and let him do so.*"

386 F.Supp. at 715 (emphasis added).[5]

Similarly, on our case, the defendant's July 22 opinion, though truthful when made, became materially misleading and therefore fraudulent sometime on or before October 11, due to knowledge acquired by

---

4. The liability of the defendant is based upon *respondeat superior* and upon its status as a "controlling person" under § 20(a) of the Securities Exchange Act.

5. *Cf. United States v. Natelli*, 527 F.2d 311, 319 (2d Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976) (holding that under § 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff(a), an accountant "has a duty to correct [an] earlier financial statement which he had audited himself and upon which he had issued his certificate, when he discovers 'that the figures in the annual report were substantially false and misleading,' and he has a chance to correct them.")

the author after July 22. The failure by the author, and thus the defendant, to correct the impression given by the July 22 letter renders the defendant liable to those who invested after October 11 (the date the duty to correct arose) in reliance on the July 22 letter.

The defendant does not dispute the plaintiffs' contention that the two letters are materially identical or that it violated its duty to correct the original letter once it was rendered fraudulent. Rather, it maintains that the plaintiffs' argument in favor of allowing those who relied on the July 22 letter after October 11 to recover damages is in reality an untimely motion for judgment n. o. v. We disagree; what the plaintiffs are now seeking from us in a ruling *in accordance* with the verdict. The above discussion of the verdict is the only rational explanation of the jury's distinction between two materially identical letters. The plaintiffs have not asked us to hold, nor do we now hold, that the July 22 letter, when written, contained material misrepresentations and/or omissions. Such a holding *would* be one not in accordance with the jury verdict, and prohibited as an untimely grant of judgment n. o. v. What we do now hold, however, is that the July 22 letter, although truthful when issued, became, according to the jury's verdict, fraudulent not later than October 11, and was unquestionably left uncorrected by the defendant. Therefore, any investor who purchased his or her limited partnership interest after October 11, 1971 in reliance on *either* the July 22 or October 11 opinion letter is now entitled to pursue his or her individual claim for damages.

## II. THE MEASURE OF DAMAGES

The fraud in this case consisted of the defendant's misrepresentations (and omissions) concerning the availability to investors of what we shall refer to, for simplicity's sake, as a "double tax deduction". According to the defendant's opinion letters, investors who purchased the limited partnership interests involved in this case could deduct from the income reported on their tax returns not only the amount of their investment but an additional and approximately equal sum representing the non-recourse loan which the defendant assumed that the drilling company would obtain from a lending institution.[6] However, for reasons explained in our September 27, 1978 opinion, this loan was not obtained by the drilling company and the double deduction could not properly be taken. Therefore, some or all of the plaintiffs who took this double deduction and who were audited by the I.R.S. had their deductions disallowed and were required to pay additional taxes.

The plaintiffs contend, however, that their damages were not limited to, nor should they be measured by, the extent of their tax problems. Rather, they argue that because of the defendant's fraud they purchased an investment described as having value as a double tax deduction, but which, in reality, lacked this value. Thus, the investment purchased was worth less than what the plaintiffs paid for it; it had value only as a speculative investment and as a "single" tax deduction.[7] The plaintiffs therefore argue that we should adopt an "out-of-pocket" measure of damages, allowing them to recover the difference between the price they paid for their investment and what it was actually worth at the time of purchase. The out-of-pocket method is in fact the traditional method employed in securities fraud cases for calculating damages,[8] and we shall adopt it here.[9]

In the case of a defrauded buyer, the out-of-pocket method permits the buyer to "recover the fair value of the consideration he paid for the security minus the fair value of the security he received, . . . measured at the time of the transaction." *Id.* at 1099. The Supreme Court and the Third Circuit Court of Appeals have adopted the out-of-pocket measure of damages in cases involving defrauded sellers.

---

**6.** Thus, for example, taxpayers in the 50% bracket would pay nothing for their investments, since their tax savings would be equivalent to the cost of the purchased security.

**7.** Investors could properly deduct the cost of their investment.

**8.** *See* Jacobs, *The Measure of Damages in Rule 10b–5 Cases,* 65 Georgetown L.J. 1093 (1977).

The defendant, while not suggesting a specific method for measuring damages, objects to our adoption of the out-of-pocket rule, and would have the measure of damages tied to the tax consequences of the investments. The defendant argues that the plaintiffs who relied on its letters and purchased their investments in order to obtain a tax shelter were damaged only in the amount of the additional taxes they had to pay as a result of I.R.S. audits. It follows from this reasoning that those plaintiffs who were not audited by the I.R.S. "got what they paid for" (a double tax deduction), and suffered no damages. At least two problems arise from allowing the motive for the investment to determine the measure of damages.

■ First, any link between the measure of damages and the motive for the investment would be based upon a "benefit of the bargain" theory which, while appropriate in a contracts case, has no place in this securities fraud litigation. The plaintiffs did not have an agreement with the defendant pursuant to which the defendant would provide them with a double tax deduction; rather, because of the defendant's fraud, those plaintiffs who relied on the defendant's letters were induced to purchase an investment for a particular amount when in fact it was worth less than that amount (assuming the plaintiffs are correct). Such securities frauds have been likened to the common law tort of deceit, and, indeed, the use in § 10(b) cases of the out-of-pocket measure of damages has been borrowed from deceit actions. *Harris v. American Invest-*

*ment Co.,* 523 F.2d 220, 224–225 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976).[10] Thus, in securities fraud cases, actual "pecuniary loss rather than loss of bargain is the measure of damages . . . ." *Harris,* 523 F.2d at 225.

A second reason for not using the tax consequences of the investment in order to measure the plaintiffs' damages is that such a measure would not make the plaintiffs whole. Although this procedure would allow the plaintiffs to recover the additional taxes which they paid, it would not compensate them for the loss, if any, caused by their purchase of a security worth less than what they paid for it. For these reasons, then, we believe that the out-of-pocket method is the appropriate one for calculating the damages sustained by the plaintiffs in this case.

### III. DISCOVERY

Having decided the above preliminary matters, we may now turn to the defendant's motion to compel answers to interrogatories and production of documents. We shall first consider the plaintiffs' general objections to the defendant's instructions, and then the specific interrogatories and document requests to which the plaintiffs have objected. These interrogatories and requests are printed in the footnote accompanying the applicable discussion.

### A. Plaintiffs' General Objections to Defendant's Instructions

■ The defendant has asked the individual members of the plaintiff class to answer

---

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Thomas v. Duralite Company, Inc.,* 524 F.2d 577 (3d Cir. 1975). In those cases, the courts defined the out-of-pocket measure of damages as permitting a defrauded seller to recover the "difference between the fair value of all that [he or she] received and the fair value of what he [or she] would have received had there been no fraudulent conduct . . . ." 406 U.S. at 155, 92 S.Ct. at 1473. This is of course the converse of the measure in cases such as ours involving defrauded buyers.

**9.** Whether the investment was actually worth less than what the plaintiffs paid for it, and

how much less it was worth, are questions for the jury. If the plaintiffs cannot prove their out-of-pocket losses, they will of course not recover. But we believe that they are entitled to proceed according to their claims as to how much damage they have suffered.

**10.** *Harris* quotes the out-of-pocket rule set forth in § 549 of the Restatement of Torts (1938). A more recent version of § 549 calculates out-of-pocket damages as "(a) the difference between the value of what [the recipient of a fraudulent misrepresentation] has received in the transaction and its purchase price or other value given for it . . . ." Restatement (Second) of Torts § 549(1)(a) (1977).

the interrogatories on the forms it has provided and in the space following each question. The plaintiffs have surprisingly and unfortunately chosen to make a federal case out of such a trivial matter, and have argued that the Federal Rules do not require a party to submit answers to interrogatories on forms provided by his or her adversary. Therefore, say the plaintiffs, they will answer the interrogatories on separate sheets of paper.

The plaintiffs are correct in their literal reading of the discovery rules. However, the defendant's request is a salutary one and will contribute to the manageability of discovery involving over 200 parties. The convenience of having answers to interrogatories written immediately after the questions is obvious and will inure to the benefit of the court as well as the parties, should the answers be submitted in evidence at the trial. Therefore, pursuant to our general power under F.R.Civ.P. 23(d) to control the procedural aspects of a class action and to prevent the undue complication of that action, we will order the plaintiffs to answer the interrogatories on the defendant's forms.

█ The plaintiffs have also objected to the defendant's instruction that each class member sign the Request for Production of Documents. We will sustain this objection. Plaintiffs' counsel maintain that they already possess many of the requested documents, and we believe that it would be more efficient and far less complicated for counsel to obtain the remaining documents from the class members and then make them available to the defendant.

### B. Interrogatory 1(c) [11]

█ The defendant contends that the information sought by this interrogatory is relevant to the issue of due diligence and the statute of limitations defense because an investor's occupation may reveal his or her financial and business sophistication and may reveal that he or she knew of the government investigation of the fraud involving the 1971 WMC Ohio Producers Limited Partnerships. The plaintiffs dispute the relevance of an investor's *present* occupation, but we believe that it may conceivably be relevant to the information the defendant is seeking and might shed light upon an investor's background, knowledge, etc. We will therefore overrule the plaintiffs' objections to this interrogatory.

### C. Interrogatory 3 [including redrafted Interrogatory 3(f)] [12]

█ The defendant claims that certain plaintiffs may have purchased their interests in the 1971 Ohio Producers Limited Partnerships *not* in reliance on the defendant's opinion letters, but because of prior successful investments in other WMC and/or ECI offerings. The defendant is correct that such an argument could be used to prove non-reliance, but not all of the information sought by Interrogatory 3 is relevant to this argument. Specifically,

11. "1. Give the following information:
    (c) Your present occupation and your occupation (if different from your present occupation) when you purchased your interest in the 1971 WMC Ohio Producers Limited Partnerships."

12. "3. If you invested in any other investments (e. g., Moray Producers 1969, 1970 and 1971 Programs, Fairdale-1971 Ohio Producers, Clintco Producers 1971) offered by Westland Minerals Corporation ("WMC"), Economic Concepts, Inc. ("ECI"), or any company or individual associated with WMC or ECI, give the following information:
    (a) The date or dates on which you purchased your interest(s):
    (b) The amount and name of each interest(s) (e. g., one-eighth interest in the Foley Well):
    (c) The number of such interests:
    (d) The purchase price of each interest:
    (e) The form of payment (e. g., cash, cash and note):
    (f) (i) Any other amounts including sales fees or sales commissions paid for or in respect of such interest(s):
    (ii) Any attorneys' or accountants' fees paid for by you in connection with your interest(s):
    (iii) Any other expenses incurred by you in connection with your interest(s):
    (g) If any of your interest(s) in one well were transferred by Westland Minerals Corporation to another well, the dates of the transfer:
    (h) The amount and name of any such transfer interest."

the information sought by Interrogatories 3(d)–(h) is not relevant to an identification of a plaintiff's interests in such other investments or the amount of production payments he or she may have received from those investments.

However, Interrogatories 3(g) and (h) are relevant in identifying those investors who obtained the partnership interests at issue in this litigation *not* by purchase but through transfer of other WMC investments. Investors who obtained their interests in this manner would not have relied on the defendant's opinion letters, and therefore this information is relevant to proving non-reliance. We will therefore sustain only the plaintiffs' objections to questions 3(d)–(f).

We agree with the plaintiffs that each investor's response should be limited to investments offered by WMC, ECI, and companies and/or individuals known by the investor, either at the time of purchase of the investment or at a later time, to be associated with WMC or ECI. If the investor does not know of such an association, then it would be impossible for him or her to answer this interrogatory as written.

### D. Interrogatory 4 [13]

■ The information sought by this interrogatory is relevant to the issue of reliance and may disclose a plaintiff's motivation for purchasing the investment at issue in this litigation. Answers to the interroga-

tory may also reveal a plaintiff's reasons for purchasing interests in earlier WMC and/or ECI ventures, which could conceivably shed light upon his or her decision to purchase the 1971 investments. We will therefore overrule the plaintiffs' objection to this interrogatory. As with Interrogatory 3, however, we will limit the answers to investments offered or sold by WMC, ECI, and companies and individuals known by the investor at the time of purchase, or later, to be associated with WMC and/or ECI.

### E. Interrogatories 5(a) and (c) [14]

■ The defendant argues that the information sought by these interrogatories is relevant to the statute of limitations defense and to the tolling of the statute of limitations, and that it may establish a date by which a reasonably diligent investor should have learned that his or her investment was in jeopardy. While it is the fraud of the defendant and not of WMC which is pertinent to this case, the evidence adduced at trial established certain connections between WMC and the defendant's employee Herman Higgins, evidence which, as discussed above, clearly played a role in the jury's verdict. It is therefore conceivable that the information sought by these interrogatories is relevant or could lead to the discovery of relevant evidence, and we will order that the interrogatories be answered.

### F. Interrogatories 8 and 9 [15]

13. "4. With respect to each person with whom you had any communications (whether in writing or orally) concerning your decision to invest in the Ohio Partnerships or any other investment offered or sold by Westland Minerals Corporation ("WMC"), Economic Concepts, Inc. ("ECI"), or any company or individual associated with WMC or ECI, give the following information:
(a) The identity of the person(s) with whom you had the communications:
(b) The dates of such communications."

14. "5. With respect to your payment(s) for your investment(s), give the following information:
(a) The manner, if known to you, in which the amounts paid by you were used by the Ohio Partnerships:
(c) What communications, if any, you had with representatives of the Ohio Partnerships,

WMC, ECI or any other person, concerning your payments and applications for funds for drilling."

15. "8. With respect to the tax treatment taken by you with respect to your investment in the Ohio Partnerships, give the following information:
(a) Whether you added or deducted any amount to or from your federal, state or local income tax returns in respect of your investment:
(b) The dates of such returns:
(c) The amounts added or deducted:
(d) The nature of the additions or deductions."
"9. With respect to audits or other actions taken by taxing authorities concerning your investment in and/or deductions for the Ohio Partnerships, state:
(a) Whether any of your additions or deductions have [sic] been questioned or have result-

These interrogatories seek the tax consequences of the plaintiffs' investments. The defendant's main argument in support of its motion to compel answers to these interrogatories is that the information sought by them is relevant to the measure of damages. However, our adoption of the out-of-pocket measure of damages makes the tax consequences of the investments irrelevant to the calculation of damages caused by the plaintiffs' purchase of the securities. However, at oral argument on February 2, 1979, the plaintiffs suggested that they might pursue claims for consequential expenses (such as accountant's and attorney's fees) which they incurred as a result of the auditing of their tax returns. If the plaintiffs do pursue such claims, the information sought by these interrogatories would be relevant.

Also, whether an investor took a double tax deduction for his or her investment is relevant to the issue of reliance. In the unlikely event that an investor did not take this deduction, failure to do so would rebut his or her claimed reliance on the defendant's opinion letters.

For these reasons we will overrule the plaintiffs' objections to these interrogatories.

ed in assessments or other action by any taxing authorities:
(b) Give the dates of any such questions, assessments or other action:
(c) The identity of the taxing authority which asked questions, made such assessments, or took such other action:
(d) The nature of such questions, assessments or actions:
(e) The disposition of such questions, assessments or actions."

**16.** "10. Identify all documents which refer, relate to, concern or contain any of the information sought in each of the foregoing Interrogatories."

**17.** "1. All documents identified in response to Interrogatory 10 of Defendant's Interrogatories to Individual Members of the Plaintiff Class."

**18.** "3. All literature which you received from Westland Minerals Corporation, Economic Concepts, Inc., Commercial Property Funding Group, Inc., or any employee or individual connected with any of these companies concerning the description of or sale of limited partnership

### G. Interrogatory 10 [16]

The plaintiffs object to this interrogatory to the extent that it calls for the identification of documents relating to those interrogatories to which their objections have been sustained. This is a valid objection, and we will therefore compel answers to Interrogatory 10 only as to those interrogatories to which we have overruled the plaintiffs' objections.

### H. Document Request 1 [17]

The plaintiffs' objection to this document request is the same as their objection to Interrogatory 10, *supra,* and will necessarily be sustained as to those interrogatories to which their objections were also sustained.

### I. Document Request 3 [18]

We will overrule the plaintiffs' objections to this document request since material received by an investor concerning the partnership interests at issue in this case is obviously relevant to the issue of reliance. Also, material concerning other WMC or related ventures could have had some bearing on an investor's decision to purchase an interest in the 1971 WMC Ohio Producers Limited Partnerships.

### J. Document Requests 4 and 11 [19]

interests in (a) the 1971 WMC Ohio Producers Limited Partnerships, (b) the Moray Producers 1969, 1970 or 1971 Programs, (c) Fairdale—1971 Ohio Producers, (d) Clintco Producers 1971, or (e) any other investments offered by Westland Minerals Corporation or related companies."

19. "4. All correspondence between you and Westland Minerals Corporation, Economic Concepts, Inc., Commercial Property Funding Group, Inc., Hays and Company, Lea Carroll, or any other company or individual concerning the progress or status of the drilling or production of the wells in the 1971 WMC Ohio Producers Limited Partnerships, including correspondence relating to leasehold titles, solicitations for contributions to litigation funds and claims asserted by creditors in any state or federal court action."

"11. All correspondence and other communications with any persons (excluding attorneys) purporting to represent any individual member of the Plaintiff Class or the Plaintiff Class itself."

The defendant claims that information in the requested documents may be relevant to determining the actual value of the plaintiffs' investments. We doubt that such information would be very helpful to this determination, since such factors as production payments are not relevant to the value of the speculative investment in the wells *at the time of purchase.* Nevertheless, since information concerning the leaseholds could conceivably shed light upon the value of the investment, we will overrule the objection to Request 4.

Information sought by Request 4, and by Request 11, may also be relevant to the statute of limitations and tolling issues, since, as with answers to Interrogatory 5, *supra,* it may establish a date by which an investor knew or should have known that his or her investment was in jeopardy. We will therefore also overrule the plaintiffs' objection to Request 11.

### K. Document Requests 5 and 6.[20]

■ As our discussion concerning Interrogatories 8 and 9 reveals, certain information concerning the tax consequences of the plaintiffs' investments is or could be relevant to this litigation. Also, an investor's 1971 tax return could reveal information relevant to the issue of reliance, since, for example, an investor in a comparatively "low" tax bracket might not have needed the type of tax shelter the defendant's opinion letters represented these investments to be.

In deciding whether to require the production of the tax returns sought by this request, we must strike a balance between two competing public policies: that favoring the confidentiality of tax returns and that favoring liberal discovery. *See Cooper v. Hallgarten & Co.,* 34 F.R.D. 482 (S.D.N.Y.1964). In our case, certain tax information is specifically relevant or could be relevant to this case, and while the information may be obtained through interrogatories, we do not believe that the defendant should be required to rely on answers to interrogatories when undeniably correct documentary evidence in the form of tax returns is available. This is not to suggest that any plaintiff would deliberately misrepresent his or her tax history, but merely recognizes that many taxpayers, confronted by an increasingly complex and turgid internal revenue code, delegate the preparation of their tax returns to accountants and sign them after only minimal scrutiny. We will therefore overrule the plaintiffs' objections to these requests.

### L. Document Request 8.[21]

We will order that the plaintiffs comply with this request only as it relates to the investment at issue in this case, the 1971 WMC Ohio Producers Limited Partnerships. The requested checks or money orders will conclusively establish which plaintiffs purchased these investments. However, we will sustain the plaintiffs' objections as to the other investments, since the amount and form of payments in other WMC and/or ECI investments are irrelevant.

## IV. PROCEDURE FOR TRYING DAMAGE CLAIMS

■ The plaintiffs have submitted various proposals for trying the individual claims for damages. Since the defendant

---

**20.** "5. All federal individual income tax returns (or any other tax returns) showing (a) any deductions taken by you for the 'loss' portion of your investment in the 1971 WMC Ohio Producers Limited Partnerships, (b) any production payments or other income received in any year by you from such investment, and (c) any adjustments which you made as a result of any audits of your investment in the 1971 WMC Ohio Producers Limited Partnerships."

"6. Correspondence with the Internal Revenue Service concerning your 'loss' deduction, including audit notices, adjustment notices, waivers of statutes of limitations, and petitions for review which you may have filed, in connection with the 1971 WMC Producers Limited Partnerships."

**21.** "8. Checks or money orders issued by you to Westland Minerals Corporation, Economic Concepts, Inc., or any other company or broker-dealer for investments made by you in the 1971 WMC Ohio Producers Limited Partnerships or in any other venture operated or controlled by Westland Minerals Corporation or Economic Concepts, Inc."

has not yet had an opportunity to conduct discovery with respect to damages or the other issues remaining to be tried, a decision by us at this time as to the appropriate method for trying damages would be premature.

## APPENDIX

### LYBRAND, ROSS BROS. & MONTGOMERY

Coopers & Lybrand
In Principal Areas
of the World

2 Broadway
New York, N.Y. 10004

July 22, 1971

Mr. Charles F. Raymond
Chairman of the Board
Westland Minerals Corporation
10642 Santa Monica Boulevard
Los Angeles, California 90025

Dear Mr. Raymond:

In accordance with your request, we have reviewed the Limited Partnership Agreement which will be used in your "1971 WMC Ohio Producers" Limited Partnerships and submit herewith our opinion, based solely on the facts contained therein and without verification by us, regarding the federal income tax consequences which can be anticipated by a limited partner in such a partnership.

*Description of the Partnership Agreement*

According to the Limited Partnership Agreement, the Limited Partner shall contribute $65,000 in cash to partnership capital and the General Partner, Westland Minerals Corporation, will contribute a specified lease upon which partnership activities will be conducted. In return for his contribution, 100% of partnership profits and losses shall be allocated to the Limited Partner until such time as he has received from operating income an amount equal to his initial $65,000 contribution; thereafter, partnership profits and losses shall be allocated seven-eights to the Limited Partner and one-eighth to the General Partner.

The partnership will adopt the cash method of accounting and will, pursuant to Section 263(c) of the Internal Revenue Code of 1954, elect to deduct as expenses any costs which may be deducted under that Section.

Upon formation of the partnership, the General Partner on behalf of the partnership will enter into a drilling contract with Rayco, Inc. whereby Rayco will undertake to drill to completion a well upon the partnership property. Upon discovery of oil or gas in commercial quantities, Rayco will equip the well for production; or, if the drilling results in a dry hole, Rayco will take such steps as are necessary to plugging and abandoning the well in accordance with local regulations. We understand that drilling operations probably will not begin until sometime in the fourth quarter of 1971.

In payment for its obligations assumed under the aforementioned drilling contract, Rayco will receive upon execution of the drilling contract $140,000 in cash. The necessary cash will be provided from the Limited Partner's cash contribution of $65,000 and through partnership borrowing for the balance. Such borrowing will be from suitable banks or other lending agencies and will be without personal liability to the General Partner and the Limited Partner.

Based upon its past experience and upon expert geological opinions, Rayco has estimated that the $140,000 received under the drilling contract will be expended on the following basis:

| | Estimated Percentage of Total | Estimated $ Amount |
|---|---|---|
| Intangible Drilling Costs | 91.5% | $128,000 |
| Tangible Completion and Equipment Costs | 8.5% | 12,000 |
| Totals | 100% | $140,000 |

*Opinion*

As mentioned above, 100% of partnership profits and losses will be allocated to the

Limited Partner until such time as he recovers his initial contribution to partnership capital out of operating income; thereafter, profits and losses shall be allocated on the basis of seven-eighths to the Limited Partner and one-eighth to the General Partner. Under Regulations 1.704–1(b)(2), such a disproportionate sharing of partnership profits and losses is permissible unless the avoidance of federal income tax is a principal purpose of the partnership agreement in this respect. Since disproportionate contributions of cash is normal in conducting drilling operations and is in accord with common practice in the industry, it seems clear that tax avoidance is not the principal purpose of the allocation. A similar position has been recognized by the Internal Revenue Service in Revenue Ruling 68–139, 1968–1 C.B. 311.

A Limited Partner's initial adjusted basis in the partnership will be equal to his capital contributions under Sections 705 and 722 of the Internal Revenue Code of 1954. Section 752(a) of the Internal Revenue Code of 1954 provides that a partner's basis in his partnership interest shall be increased by his share of any partnership liabilities. Where no partner has any personal liability with respect to a partnership liability, Regulation 1.752–1(e), provides that all partners, including limited partners, shall be deemed to share such liability in the same proportion as partnership profits are shared.

Section 704(d) provides that a partner's deductions for his distributive share of partnership losses are limited to his adjusted basis in the partnership.

Under the above Code Sections and Regulations, the Limited Partner in the present case should receive an adjusted basis for his partnership interest which will equal his initial cash contribution plus the full amount of partnership debt incurred to finance the development of the partnership properties since, under the Partnership Agreement, 100% of profits and losses will be allocable to the Limited Partner when the debt is incurred. Thus the maximum limitation on the amount of partnership losses which can be claimed by the Limited Partner on his individual income tax return will be $140,000, comprised of his $65,000 cash contribution plus the $75,000 debt incurred under the drilling contract.

Since the partnership will adopt the cash method of accounting, any expenses contracted for and paid for during a taxable year must be taken into account on the Federal partnership return of income for that year. Regulations 1.461–1(a)(1). Each partner must deduct his distributive share of such expenses on his Federal income tax return for the taxable year in which he receives such distributive share. *Pauley v. U. S.*, 63–1 USTC para. 9280. See also Revenue Ruling 71–252 I.R.B. 1971–23, 17.

In accordance with the above principles, it is our opinion that the portion of the amount paid upon executing the drilling contract which can be allocated to non-capital items under that contract will be deductible by the Limited Partner on his individual income tax return for the year in which such payment is made.

Amounts attributable to capital items such as tangible completion and equipment costs must be capitalized and recovered through depreciation deductions in subsequent years.

Since drilling operations probably will not commence until the fourth quarter of 1971, it does not appear that any significant amount of revenue from production operations can be expected to be available to reduce partnership losses in calendar year 1971.

Accordingly, assuming that the estimated figures provided by Rayco as to allocation of proceeds are accurate, and that both the Partnership Agreement and the drilling contract are executed in calendar year 1971, a cash basis Limited Partner having a calendar taxable year should be entitled to claim a deduction of approximately $128,000 on his 1971 individual income tax return.

Very truly yours,

(s) Lybrand, Ross Bros. & Montgomery

FAG:ic

# LYBRAND, ROSS BROS. & MONTGOMERY

Coopers & Lybrand
In Principal Areas
of the World

2 Broadway
New York, N.Y.  10004

October 11, 1971

Mr. Charles F. Raymond
Chairman of the Board
Westland Minerals Corporation
10642 Santa Monica Boulevard
Los Angeles, California 90025

Dear Mr. Raymond:

In accordance with your request, we have reviewed the Limited Partnership Agreement which will be used in your "1971 WMC Ohio Producers" Limited Partnerships and submit herewith our opinion, based solely on the facts contained therein and without verification by us, regarding the federal income tax consequences which can be anticipated by a limited partner in such a partnership.

### Description of the Partnership Agreement

According to the Limited Partnership Agreement, the Limited Partner shall contribute $65,000 in cash to partnership capital and the General Partner, Westland Minerals Corporation, will contribute a specified lease upon which partnership activities will be conducted. In return for his contribution, 100% of partnership profits and losses shall be allocated to the Limited Partner until such time as he has received from operating income an amount equal to his initial $65,000 contribution; thereafter, partnership profits and losses shall be allocated seven-eighths to the Limited Partner and one-eighth to the General Partner.

The partnership will adopt a calendar-year accounting period, the cash method of accounting and will, pursuant to Section 263(c) of the Internal Revenue Code of 1954, elect to deduct as expenses any costs which may be deducted under that Section.

Upon formation of the partnership, the General Partner on behalf of the partnership will enter into a drilling contract with Rayco, Inc. whereby Rayco will undertake to drill to completion a well upon the partnership property. Upon discovery of oil or gas in commercial quantities, Rayco will equip the well for production; or, if the drilling results in a dry hole, Rayco will take such steps as are necessary to plugging and abandoning the well in accordance with local regulations. We understand that drilling operations probably will not begin until sometime in the fourth quarter of 1971.

In payment for its obligation assumed under the aforementioned drilling contract, Rayco will receive upon execution of the drilling contract $140,000 in cash. The necessary cash will be provided from the Limited Partner's cash contribution of $65,000 and through partnership borrowing for the balance. Such borrowing will be from suitable banks or other lending agencies and will be without personal liability to the General Partner and the Limited Partner.

Based upon its past experience and upon expert geological opinions, Rayco has estimated that the $140,000 received under the drilling contract will be expended on the following basis:

|  | Estimated Percentage of Total | Estimated $ Amount |
|---|---|---|
| Intangible Drilling Costs | 91.5% | $128,000 |
| Tangible Completion and Equipment Costs | 8.5% | 12,000 |
| Totals | 100% | $140,000 |

### Opinion

As mentioned above, 100% of partnership profits and losses will be allocated to the

356

Limited Partner until such time as he recovers his initial contribution to partnership capital out of operating income; thereafter, profits and losses shall be allocated on the basis of seven-eighths to the Limited Partner and one-eighth to the General Partner. Under Regulations 1.704–1(b)(2), such a disproportionate sharing of partnership profits and losses is permissible unless the avoidance of federal income tax is a principal purpose of the partnership agreement in this respect. Since disproportionate contributions of cash are normal in conducting drilling operations and are in accord with common practice in the industry, it seems clear that tax avoidance is not the principal purpose of the allocation. A similar position has been recognized by the Internal Revenue Service in Revenue Ruling 68–139, 1968–1 C.B. 311.

A Limited Partner's initial adjusted basis in the partnership will be equal to his capital contributions under Sections 705 and 722 of the Internal Revenue Code of 1954. Section 752(a) of the Internal Revenue Code of 1954 provides that a partner's basis in his partnership interest shall be increased by his share of any partnership liabilities. Where no partner has any personal liability with respect to a partnership liability, Regulation 1.752–1(e) provides that all partners, including limited partners, shall be deemed to share such liability in the same proportion as partnership profits are shared.

Section 704(d) provides that a partner's deductions for his distributive share of partnership losses are limited to his adjusted basis in the partnership.

Under the above Code Sections and Regulations, the Limited Partner in the present case should receive an adjusted basis for his partnership interest which will equal his initial cash contribution plus the full amount of partnership debt incurred to finance the development of the partnership properties since, under the Partnership Agreement, 100% of profits and losses will be allocable to the Limited Partner when the debt is incurred. Thus the maximum limitation on the amount of partnership losses which can be claimed by the Limited Partner on his individual income tax return will be $140,000, comprised of his $65,000 cash contribution plus the $75,000 debt incurred to finance payments under the drilling contract.

Since the partnership will adopt the cash method of accounting, any expenses contracted for and paid for during a taxable year, must be taken into account on the Federal partnership return of income for that year. Regulations 1.461–1(a)(1). Each partner must deduct his distributive share of such expenses on his Federal income tax return for the taxable year in which the taxable year of the partnership in which the expenses are paid ends. *Pauley v. U. S.* 63–1 USTC para. 9280. See also Revenue Ruling 71–252, I.R.B. 1971–23, 17.

In accordance with the above principles, it is our opinion that the portion of the amount paid upon executing the drilling contract which can be allocated to non-capital items under that contract will be deductible by the Limited Partner on his individual income tax return for the year in which the partnership taxable year in which such payment is made ends.

Amounts attributable to capital items such as tangible completion and equipment costs must be capitalized and recovered through depreciation deductions in subsequent years.

Since drilling operations probably will not commence until the fourth quarter of 1971, it does not appear that any significant amount of revenue from production operations can be expected to be available to reduce partnership losses in calendar year 1971.

Accordingly, assuming that the estimated figures provided by Rayco as to allocation of proceeds are accurate, and that both the Partnership Agreement and the drilling contract are executed in calendar year 1971, a cash basis Limited Partner having a calendar taxable year should be entitled to

claim a deduction of approximately $128,000 on his 1971 individual income tax return.

In the event that the partnership property is sold, the investor will recognize gain to the extent of his distributive share of any partnership gain on such sale. In computing such partnership gain, the proceeds of sale realized by the partnership are deemed to include the amount of any partnership obligations assumed by the purchaser. Since you have indicated that the venture will hold leases only for development purposes and not primarily for resale, most of any gain realized by the partnership from the sale of property held for more than six months should be considered gain from the sale of property used in the trade or business under Section 1231(b) of the Internal Revenue Code. See Revenue Ruling 68–226, 1968–1 C.B. 362. Such gain is usually treated as long-term capital gain, unless offset by certain losses as provided in Section 1231. Depreciation recapture, if any, is taxed as ordinary income.

If the property passes to a third party in accordance with the default provisions of any note or other obligation of the partnership, such foreclosure will be deemed to constitute a sale or exchange of such property under the principles set forth in *Rogers v. Commissioner,* 39–1 USTC para. 9490 (9th Cir. 1939) and *Lutz & Schramm Co.,* 1 T.C. 682. See also Revenue Ruling 67–188, 1967–1 C.B. 216. Accordingly, the partnership will realize a gain to the extent that the unpaid balance of the note exceeds the partnership's adjusted basis in the subject property. Under the principles espoused in the aforementioned *Rogers* case and in *Leland S. Collins,* 22 TCM 1467, it would appear that any disposition, either voluntary or involuntary, through transfer of the property to the holder of the note should not be regarded as forgiveness of indebtedness and, accordingly, should be treated as a sale or exchange of property used in the partnership's trade or business, and taxed, as discussed, above, under Section 1231.

Very truly yours,

(s) Lybrand, Ross Bros. & Montgomery

DTW:rm