**Bruce H. GREENFIELD, et al.**

v.

**HEUBLEIN, INC., R.J. Reynolds Industries, Inc., and R.J. Reynolds Tobacco Company.**

Civ. A. No. 82–3463.

United States District Court,
E.D. Pennsylvania.

Oct. 19, 1983.

Edwin Rome, Philadelphia, Pa., for plaintiffs.

Thomas N. O'Neill, Jr., Philadelphia, Pa., for Heublein, Inc.

John Harkins, Philadelphia, Pa., for R.J. Reynolds Industries, R.J. Reynolds Tobacco.

## MEMORANDUM

NEWCOMER, District Judge.

Before the Court is the defendants' motion for summary judgment as to Counts I and II of the complaint and for dismissal of Counts III and IV of the complaint.

This action has its roots in the attempted takeover of the defendant, Heublein, Inc., by the General Cinema Corporation; a takeover that eventually led to the acquisition of Heublein by a "white knight," the defendant Reynolds Industries, Inc. ("Reynolds").[1]

The plaintiff is a Heublein shareholder who sold his shares shortly before the acquisition of Heublein was made public. He claims that a statement issued by Heublein several weeks before the announcement of the acquisition was materially misleading and thus violated Section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 and Section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e). Reynolds is charged with aiding and abetting Heublein's violations of these provisions.

Rule 56 of the Federal Rules of Civil Procedure provides the standard that must be used in ruling on motions for summary judgment. That rule provides, in pertinent part, that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

1. The R.J. Reynolds Tobacco Co. is also a named defendant. All parties have agreed, however, that this corporation was simply the vehicle for Reynolds Industries' acquisition of Heublein. Accordingly, I will dismiss all claims asserted against the R.J. Reynolds Tobacco Company.

moving party is entitled to judgment as a matter of law.

The moving party, of course, has the burden of establishing that it is entitled to summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Thus, the following summary presents the facts in the light most favorable to the plaintiff:

The plaintiff purchased 400 shares of Heublein common stock in 1977 at a price of $26.625 per share. In early 1982, he learned that the General Cinema Corporation was commencing a hostile takeover of Heublein.

As a result of the General Cinema situation he kept close track of the trading in Heublein stock. On July 14, 1982, the price of Heublein common stock went up $2¾ per share in very heavy trading.[2] On the afternoon of July 14, 1982, Heublein, in response to a query by the New York Stock Exchange, issued a statement which was reported by Dow Jones as follows:

> A spokesman for Heublein, Inc. said the Company was aware of no reason that would explain the activity in its stock in trading on the NYSE today.

In the days that followed, Heublein stock continued to be traded at a high volume and maintained its price.[3] Plaintiff decided to sell his stock because he believed that it was fully priced. This decision was made on the basis of the Heublein statement, a statement made by General Cinema in early June that it would not acquire additional stock, and the integrity of the market in Heublein stock. The plaintiff examined the available public information and could see no reason to hold on to his Heublein shares. On July 27, 1982, the plaintiff sold his Heublein stock for $45.25 per share.

On the following afternoon trading was suspended in Heublein stock. At 1:24 p.m. Heublein issued the following press release:

> At Heublein's request, the New York Stock Exchange has suspended trading in the company's stock. There is a matter in the mid-stream of development and the company expects to have a statement tomorrow.

On July 29, Heublein and Reynolds announced that their Boards of Directors had agreed to a merger. Under the merger agreement, Reynolds would make a cash tender offer for 11,350,000 Heublein shares (about 52% of Heublein's then outstanding common stock) at a price of $63.00 per share.[4] The remaining 48% of the Heublein shares would be exchanged for a package of Reynolds' common and preferred stock having a combined value of $56.83 per Heublein share. Plaintiff has brought this action on behalf of himself

---

**2.** On July 13, 1982, 32,500 shares of Heublein were traded on the New York Stock Exchange, closing at $40¼. On July 14, 1982, 242,500 shares were traded. The closing price was $43.00.

**3.** The trading in Heublein stock during the relevant time period is summarized on the following table:

| Date | Volume | Closing Date | High Sale | Low Sale |
|---|---|---|---|---|
| July 13 | 32,500 | 40¼ | 40⅝ | 40¼ |
| July 14 | 242,500 | 43 | 44½ | 40 |
| July 15 | 249,100 | 45 | 45 | 42¾ |
| July 16 | 173,100 | 43⅛ | 45⅜ | 42½ |
| July 19 | 123,000 | 43¾ | 44½ | 43½ |
| July 20 | 141,400 | 44¾ | 45¾ | 44 |
| July 21 | 207,700 | 43¾ | 45⅛ | 43½ |
| July 22 | 97,200 | 44 | 44⅝ | 43⅝ |
| July 23 | 31,400 | 43⅝ | 44¼ | 43½ |
| July 26 | 47,800 | 44 | 44⅜ | 43¼ |
| July 27 | 171,300 | 45⅛ | 45⅜ | 44¼ |
| July 28 | 325,200 | 47¾ | 48 | 45 |

**4.** If more than 52% of Heublein's stock was tendered, then the shares were to be accepted on a pro rata basis.

and other Heublein shareholders who sold their shares between July 15 and the suspension of trading on July 28.[5]

The plaintiff seeks to recover the difference between the value he received for his Heublein shares and the value he would have received pursuant to the merger agreement. He alleges that Heublein's statement of July 14th was materially misleading because it did not disclose developments relating to General Cinema and to Reynolds. He further alleges that Heublein had a duty to correct its July 14th statement well before the announcement of July 28th. The defendants contend that there was nothing material to disclose prior to July 28, and that, therefore, they are entitled to summary judgment.

As previously stated the acquisition of Heublein by Reynolds was generated by General Cinema's hostile bid to gain control of Heublein. The facts relating to that bid may be summarized as follows:

Between November, 1981, and February, 1982, General Cinema purchased 2.1 million shares of Heublein common stock, about 9.7% of the shares then outstanding. On February 3, 1982, General Cinema filed a Schedule 13D with the Securities Exchange Commission.[6] The Schedule claimed that the stock had been purchased for "investment" only. It further stated that General Cinema would increase its level of ownership in Heublein to 15% and would file the notification required under federal antitrust laws to enable it to purchase up to 49.9% of Heublein's stock. Heublein responded by filing suit against General Cinema on February 19, 1982, alleging that General Cinema had violated the 1934 Act by filing a false and misleading Schedule 13D that concealed General Cinema's intention to seek control of Heublein and by making an illegal tender offer. Heublein had also purchased by March, 1982, 3.5% of General Cinema's stock and had filed its own statement under the antitrust laws enabling it to purchase 49.9% of General Cinema's stock.

Heublein further responded to the threat from General Cinema by organizing an internal "task force" of executives to identify and evaluate the options available to Heublein in the face of the threat from General Cinema. This group was composed of Hicks Waldron, President and Chief Executive Officer of Heublein, Stuart D. Watson, Heublein's Chairman, Gwain H. Gillespie, Senior Vice President, Finance and Administration, George J. Caspar, Vice-President, Secretary and General Counsel, Gene R. Ehnen, Vice-President, Finance, Robert W. Pratt, Vice-President, Planning and Research, Jack Chisholm, Director of Development, and William Henn, Director of Strategic Planning. The group was at times joined by its outside advisors, H. Frederick Krimendahl, II of the investment banking firm of Goldman, Sachs & Co., Arthur Fleischer, Jr. of the law firm of Fried, Frank, Harris, Shriver and Jacobson (counsel to Goldman Sachs) and John McNally of the law firm of White & Case (counsel to Heublein).

It was immediately recognized that one of the options open to Heublein was to sell the company to a friendly suitor, or "white knight," in order to avoid a hostile takeover by General Cinema. During March or April of 1982 a list of possible "white knights" was compiled by the group with the aid of Goldman Sachs. Reynolds was one of a number of corporations identified as a possible merger partner.

The group also examined other possible responses to General Cinema. These included the possibility of negotiating an

---

**5.** I have not yet addressed the issue of class certification. Pursuant to an agreement of the parties this issue is not to be raised until after the resolution of the issues raised in the present motion for summary judgment.

**6.** A Schedule 13D statement is a disclosure statement that must be filed with the S.E.C. by open-market purchasers of large numbers of shares of stock in a single company. The statement is required by Section 13(d) of the Securities Exchange Act of 1934, Act of June 6, 1934. 48 Stat. 881, *as amended,* Pub.L. 90–439, 82 Stat. 454 (1968), 15 U.S.C. § 78m(d), and S.E.C. Rule 13(d)(1), 17 C.F.R. § 240.13d–1 (1981), promulgated thereunder.

agreement with General Cinema aimed at either an "asset swap" or a "standstill," and the acquisition by Heublein of businesses that would serve to block General Cinema's takeover bid by creating antitrust or other problems for General Cinema. The testimony of the members of the Heublein task force clearly indicates that these options were far more palatable to Heublein's management than was the acquisition of Heublein by a "white knight." In fact, prior to July, Waldron and Watson did not permit the subject of a white knight to be discussed at strategy group meetings because they felt that such discussions would distract Heublein's management from ongoing business concerns.

During the spring of 1982, General Cinema continued to purchase Heublein stock. By May of 1982 General Cinema held 18.9% of Heublein's outstanding shares. These purchases were widely covered by the press.

May of 1982 also brought certain developments at Reynolds concerning the General Cinema—Heublein situation. The increasing pressure placed on Heublein by General Cinema led Reynolds to conduct a detailed study of the possibility of acquiring Heublein. This study was known as "Project Flag," "Flag" being a code name for Heublein. Reynolds had for years been interested in broadening its consumer products base. Heublein was one of the companies that Reynolds considered as a good candidate for acquisition. Reynolds' interest in Heublein was reinforced by the fact that Reynolds' Chairman, J. Paul Sticht, had known Heublein's Chairman, Stuart Watson, for a number of years.

On May 7, 1982, the Project Flag group produced a report on Heublein. After General Cinema's announcement that it had acquired 18.9% of Heublein's stock, the Project Flag group prepared a more comprehensive report. This report included a description of Heublein, an assessment of how Heublein might fit into Reynolds, and a summary of the General Cinema—Heublein situation. The report was kept secret, and was only available to the members of Reynolds' Management Committee and the Project Flag group. The report was prepared by the Project Flag group without the assistance of outside advisors. On the basis of these reports, Reynolds' management concluded that Heublein was an attractive acquisition possibility, but that Reynolds should not become embroiled in a bidding contest to gain control of Heublein. Reynolds' Vice-Chairman, Joseph F. Abely, Jr., concluded in a memo to Sticht that Reynolds' best course of action was to wait in the wings and see if Heublein eventually had to resort to a "white knight."

On May 7, 1982, Heublein's President, Hicks Waldron, met with Richard B. Smith, General Cinema's Chairman and President. The purpose of the meeting was to discuss a possible "swap," specifically, an exchange of General Cinema's Heublein stock for a part of Heublein's Wine Division. This meeting did not result in an agreement. Beginning in late May, Heublein and General Cinema entered into negotiations concerning the possibility of a standstill agreement, i.e., an agreement under which General Cinema would stop buying Heublein shares and accept some restrictions on the use of the shares they already owned in exchange for representation on Heublein's board and other concessions. These negotiations, conducted both through investment bankers and directly, continued into early July. By July 7th Waldron felt that he and Smith were nearing an agreement. On July 8, however, Smith called Waldron and made significant changes in General Cinema's negotiating position. Smith made certain "non-negotiable" demands which he knew were unacceptable to Heublein. He also changed course by asserting that General Cinema was primarily interested in a "swap" for Heublein's Grocery Products Division, rather than in reaching a "standstill" agreement. General Cinema's position was a severe blow to Waldron's hopes of negotiating a settlement of the General Cinema situation. These hopes were further shaken when Waldron learned that General Cinema was going to sell a television station it owned in Miami. Waldron feared that Gen-

eral Cinema would be able to use the proceeds of this sale to finance the acquisition of even more Heublein stock on the open market. Negotiations continued, however. Waldron and Edward Bates, a Heublein Director, met with Smith and Abram Collier, a General Cinema director, on July 21st, and Waldron telephoned Smith with a proposal on July 23rd. Smith adhered to his non-negotiable demands, however, and no agreement was ever reached.

During the period of negotiations between Waldron and Smith, there were contacts between Heublein and Reynolds. On June 13th and 14th, Waldron and Sticht met at the Greenbriar Hotel in White Sulfur Springs, West Virginia. Both were there to attend an executive conference of the Grocery Manufacturers of America. At the meeting Sticht informed Waldron that while Reynolds would take no hostile actions against Heublein, Reynolds was interested in getting together with Heublein. Sticht told Waldron that Reynolds had completed a study of Heublein and that he was impressed by the results of that study. Waldron informed Sticht that Heublein was determined to remain independent, and that he believed that they would be able to do so. He added, however, that if this was not possible he would be in touch.

The next meeting between the top management of Heublein and Reynolds occurred on July 9th. This meeting was prompted by the sudden deterioration of negotiations between Heublein and General Cinema, precipitated by the telephone call from Smith to Waldron on July 8th.

The sudden change in General Cinema's negotiating posture alarmed Waldron. He suggested to Watson that they meet with Sticht because they should make some preparation for resorting to a "white knight," a move for which they were totally unprepared at that time. Waldron called Sticht and told him about General Cinema's ultimatums and suggested that they meet to discuss the possibility of a merger.

Sticht agreed to meet with Watson and Waldron on the afternoon of July 9 at the Hartford airport.

On Friday afternoon, July 9th, Waldron called a meeting attended by the task force, Heublein's investment banker, and outside counsel. While the possibility of Reynolds acting as a white knight was raised at the meeting, Waldron did not inform the group at large of the planned meeting with Sticht later that day. The group did discuss, however, other possible responses to the new developments in the General Cinema situation. These included the pursuit of a possible blocking acquisition by Heublein as well as the possibility of acceding to some of Smith's demands. At the end of the meeting, Waldron asked all members of the strategy group except Heublein's senior executives to leave the room so that there could be a private session with Heublein's outside advisors. At that session Krimendahl, Fleischer, and McNally were told that Waldron felt it was time to explore the "white knight" solution in case the General Cinema situation could not otherwise be resolved. Waldron explained that he and Watson were meeting with Sticht that afternoon. He stated that the meeting was for the purpose of getting acquainted, and not for negotiations. Waldron explained that the meeting should not be discussed with anyone not present in the room, with the exception of George Caspar, Heublein's General Counsel.[7]

At the meeting, Waldron told Sticht that Heublein intended to remain independent if at all possible. He explained that he had asked for the meeting in order to learn more about Reynolds, but not to negotiate a possible combination. The rest of the meeting was generally taken up by Sticht's description of Reynolds and the possible synergies that would exist if Heublein and Reynolds were combined. Sticht also discussed Reynolds' management philosophy as well as the role that Waldron and other

---

7. Caspar had left the room with the other members of the strategy group in order to avoid any embarrassment.

Heublein executives would play in the combined companies.[8]

At the end of the meeting Waldron and Watson reiterated their resolve to maintain Heublein's independence. They also expressed, however, the feeling that a merger with Reynolds "would be okay." Sticht told Watson and Waldron that Reynolds was prepared to go ahead with the merger, and that he hoped they would be in touch.

On July 14, Sticht reported the substance of the July 9th meeting to the Reynolds Management Committee. It was agreed that Reynolds should continue to monitor trading in Heublein stock and be prepared to pursue Heublein should it appear that Heublein would not be able to maintain its independence. Waldron reported the substance of the meeting to Krimendahl and expressed his satisfaction with what he had heard from Sticht. Waldron asked Krimendahl to pass the information along to McNally at White & Case.

On July 14th, Waldron received a call from Smith confirming the rumor that General Cinema was going to sell its Miami television station. While Smith told Waldron not to be upset by the news, Waldron was alarmed because the proceeds of the sale would enable General Cinema to resume their purchases of Heublein shares on the open market. Waldron felt that Heublein could not protect itself from such continued large block acquisitions.

At 3:55 in the afternoon on July 14th, George Caspar, Heublein's General Counsel, received a call from the New York Stock Exchange. Caspar was informed that Heublein's stock was up $3\frac{7}{8}$ to $44.00 on a trading volume of 235,200 shares, and that the stock had hit a high of $44½ dollars that day.[9] Caspar was asked if Heublein was aware of anything that could have caused the increased activity in Heublein stock. Caspar was aware that Salomon Brothers had made a 100,000 share institutional trade early in the day.[10] He also knew that only 153,800 shares had been traded by 2:00 p.m., without a significant price increase. The price had only climbed $\frac{2}{8}$ by 3:00 o'clock, with the volume at 209,300 shares. By the time the New York Stock Exchange called Caspar, an additional 27,000 shares had been traded with a rise in price from $41\frac{1}{8}$ to 44. The stock closed at 43 on a volume of 242,500.

Caspar stated that he was not aware of anything that could account for the increased trading. He was asked to issue a press release stating that there were no "corporate developments." After consulting with Gillespie and McNally[11], Caspar issued the following statement on behalf of Heublein:

> A spokesman for Heublein, Inc. said the company was aware of no reason that would explain the activity in its stock in trading on the New York Stock Exchange today.

After Waldron's July 14th conversation with Smith, Waldron decided that it would be advisable to meet with Sticht again. Waldron called Sticht and set up a meeting for the evening of July 15th in Hartford. Sticht felt that Heublein was desperate after hearing of General Cinema's sale of its Miami TV station, and agreed to fly to Hartford that very night to meet with Waldron and Watson. On the same date, Reynolds completed a merger game plan for "Project Flag." This plan was designed to enable Reynolds to proceed with a Heublein merger as smoothly and quickly as possible.

*New York Stock Exchange Company Manual,* Section A2, at A–18.

8. It was suggested that Waldron would be head of a joint Reynolds/Heublein food operation and that Watson and Waldron would become directors of Reynolds.

9. See chart at footnote 3, *supra.*
 The New York Stock Exchange computer is programmed to "flag" stocks with unusual price and volume changes so that the Exchange staff can investigate the reasons for the activity.

10. Caspar's secretary kept an hour by hour report on trading activity in both Heublein and General Cinema stock.

11. There is some dispute as to whether Caspar or Gillespie was aware of the July 9th meeting at the time the July 14th statement was issued.

On the evening of July 15th, Sticht met with Watson and Waldron for about three hours at Watson's house in Hartford. Sticht attempted to convince Waldron and Watson that Heublein and Reynolds should "join forces." Much of the evening was spent discussing the accommodation of Heublein's management team into Reynolds. Also discussed were the General Cinema situation, the level of trading in Heublein stock, and the July 14th press release.[12] While Sticht expressed his desire to see a Reynolds/Heublein merger, he also stated that Reynolds did not intend to get involved in a bidding war for Heublein. Waldron reaffirmed Heublein's commitment to remain independent, but said that he thought it advisable to get to know Sticht and Reynolds better so that they could move quickly in the event General Cinema forced Heublein to turn to a "white knight."

At the conclusion of the meeting, Sticht suggested that Reynolds and Heublein arrange to have their investment bankers meet. Sticht explained that Reynolds had decided to bring its investment banker, Dillon, Read & Co., into the picture. Waldron agreed to have Dillon Read meet with Goldman Sachs. On July 16th, Sticht told Abely to instruct Dillon Read to meet with Goldman Sachs. Abely did so, and also had the latest Project Flag analysis sent to Dillon Read. This analysis contemplated acquisition prices of $50, $55 and $60 per share.

Heublein instructed Krimendahl of Goldman Sachs to meet with Dillon Read. On Monday, July 19, Goldman Sachs gave Heublein a document which included pro forma merger plans with Reynolds at $50, $55, $60, and $65 per share.

John Mullin of Dillon Read and Krimendahl of Goldman Sachs met on either July 19 or 20. Krimendahl told Mullin that the investment houses really had nothing to discuss, so the conversation was discontinued. Sticht called Waldron and expressed his surprise that more substantive discussions had not occurred.

In the meantime, it was decided that more progress might be made in negotiations with General Cinema if someone other than Smith and Waldron were present at the discussions. Consequently, a meeting was held on July 21st. Present was Smith, Abram Collier, an outside director of General Cinema, Waldron, and Edward Bates, an outside director of Heublein. The meeting resulted in no further progress towards a "standstill" agreement. Smith still adhered to certain "non-negotiable" demands that were unacceptable to Heublein, and expressed his preference for a "swap" involving Heublein's Grocery Products Division.

On Friday, July 23, Waldron called Smith and made some proposals for structuring a Grocery Products swap. Smith then appeared to change course and express a preference for a standstill agreement, including the "non-negotiable" terms he had previously insisted upon. Smith also made several comments about the time pressure on General Cinema, and stated that if the agreement could not be reached in a few days General Cinema would have to go back to the market and resume its purchases of Heublein stock.

After this call, Waldron called Watson and told him of Smith's ultimatum. Both agreed that it was time to approach Reynolds and commence merger negotiations.

Waldron then contacted Sticht, who was in flight to the West Coast. Sticht called Waldron from California that evening. Waldron told Sticht that Heublein could no longer maintain its independence and suggested that the investment bankers meet and initiate negotiation of a possible merger. Sticht agreed and suggested that the principals get together once he had returned to the East Coast.

On July 26, the investment bankers met in New York and for the first time began

---

12. Sticht recalls discussing the press release, Waldron and Watson do not. In any event, none of the parties expressed the feeling that the release should be modified or updated as a result of their meeting.

to negotiate the price that Reynolds would be willing to pay Heublein stockholders for their Heublein stock. No reference to a dollar amount had previously been made either between the investment bankers or between Heublein and Reynolds. Sticht and Waldron had discussed, however, Waldron's future and the future of other Heublein executives, in the event that Heublein and Reynolds merged.

Prior to the meeting, the Heublein strategy group suggested that a price in the range of $60 to $65 per share would be fair. The Reynolds group had independently arrived at a $55 per share figure.

During the meeting, Dillon Read proposed a $50–$53 figure. Krimendahl reported to Waldron and Watson that Dillon Read would not go to $55. Watson told Krimendahl that he would not agree to sell the company for $55. The investment bankers meeting on July 26 ended, therefore, without agreement. That night Sticht called Waldron and suggested that the principals should meet and see if they could succeed where the investment bankers had failed. Waldron agreed.

On Thursday morning, July 27, Waldron and Watson met with Sticht in New York. By the end of the day the two sides had agreed that they would recommend a price of $60 per share to their boards. The bankers and lawyers were then charged with drafting an agreement that could be taken to the Heublein and Reynolds boards for approval.

A problem surfaced, however, between Heublein and Reynolds at the last minute. The issue, raised initially by Reynolds' outside advisors on Tuesday night, was whether Reynolds would have the right to withdraw from a merger agreement if some other person or group succeeded in acquiring $33\frac{1}{3}\%$ or more of Heublein's stock before a merger between Heublein and Reynolds was accomplished.

Under Connecticut law (Heublein is a Connecticut corporation), the acquisition of $33\frac{1}{3}\%$ of Heublein's shares by a third party (such as General Cinema) could block the proposed Reynolds/Heublein merger.

Reynolds wanted the withdrawal right in order to protect itself against the possibility of becoming only an equity investor in Heublein. Waldron and Krimendahl, Heublein's investment banker, were adamantly opposed to granting Reynolds such withdrawal rights. Reynolds, on the other hand, made it clear that it would not go forward without the right to withdraw.

This impasse was not broken until Thursday morning, July 29, when Sticht called Waldron and persuaded him to agree to Reynolds' demand despite the fact that Krimendahl remained adamant in his opposition to it. In the meantime, the details of the merger were negotiated; i.e., the number of shares to be acquired by Reynolds through the initial cash tender, the number to be acquired through an exchange for a package of Reynolds common and preferred stock, and the precise nature of the Reynolds equity package.

At 12:45 p.m. on July 28th, Caspar received a call from the New York Stock Exchange. He was informed that Heublein's stock was up $2\frac{1}{2}$ points at $47\frac{3}{4}$ with a high volume of trading. The New York Stock Exchange requested that Heublein issue another "no corporate development" statement. Caspar said he would check and call back.

At 1:05 p.m. Caspar called the exchange and stated that he could not issue a "no corporate development" statement because there was a matter "in the works" about which Heublein was not yet ready to make a statement. Caspar stated that it would be prudent to have trading suspended in Heublein's stock. He was told that Heublein would have to formally request the New York Stock Exchange to stop trading and issue a press release to that effect.

At 1:20 p.m. Caspar again called the New York Stock Exchange and formally requested that the Exchange suspend trading in Heublein stock. This was accomplished at 1:24 p.m. Simultaneously, Heublein issued the following release:

At Heublein's request, the New York Stock Exchange has suspended trading

in the company's stock. There is a matter in mid-stream of development and the company expects to have a statement tomorrow.

That afternoon, Reynolds also requested that trading in its stock be suspended pending an announcement.

On Thursday, July 29th, the merger was approved by the Heublein and Reynolds boards.

As a result of the merger, the General Cinema takeover was averted. Heublein retained a large degree of operational autonomy, and Heublein's management preserved their positions and their financial security.[13]

DISCUSSION

Count I of the complaint alleges that Heublein's July 14th statement was materially misleading and that Heublein's subsequent failure to correct the statement was a "material omission," both resulting in a violation of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e).[14]

Count II of the complaint charges Reynolds with aiding and abetting Heublein's violations alleged in Count I. Counts III

and IV charge Heublein with breach of fiduciary duty and common law fraud. The defendants have moved for summary judgment on Counts I and II of the complaint. They have also moved for dismissal of the pendent claims contained in Counts III and IV, should this Court enter judgment in favor of the defendants on Counts I and II.

COUNT I

In order to establish Heublein's liability under Count I of the complaint, the plaintiff must show that: (1) Heublein, acting with scienter, (2) misstated or omitted a material fact, (3) that he, the plaintiff, justifiably relied on the misinformation, and (4) that the misinformation caused him to suffer economic injury in the purchase or sale of securities.

The record in this case, and the reasonable inferences drawn from that record, would permit a jury to find that the plaintiff suffered economic harm from selling his stock in reliance on Heublein's July 14th statement. The record does not support a finding in favor of the plaintiff, however, on the issue of whether Heublein misstated or omitted a material fact in violation of the Federal Securities Laws.

---

**13.** Watson, who resigned as Chairman of Heublein on July 28, was engaged as a consultant through September 30, 1986 for a fee of $600,-000. Watson will be entitled to retirement benefits of $64,924 after July 1, 1985. Watson and Waldron were both paid over two million dollars to surrender stock options and performance shares previously granted by Heublein. As a group, all Heublein officers and directors received over fourteen million dollars for the surrender of these shares. Waldron was also granted 2107 shares of Reynolds common and 2107 performance shares. This stock has a potential value of $98,766.

**14.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
Section 14(e) of the Act applies to tender offers and is worded similarly:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive or manipulative.

The plaintiff alleges four separate violations of § 10b, Rule 10b–5, and § 14(e):

(1) Heublein's failure to disclose material developments in the General Cinema situation;

(2) Heublein's failure to disclose what is claimed to be an agreement in principle to merge with Reynolds;

(3) The issuance what is alleged to be a false and misleading press release on July 14th;

(4) The failure to correct, modify or rescind the July 14th release in light of subsequent developments that allegedly rendered the release misleading.

In order for a misstatement or omission to violate Rule 10b–5 or Section 14(e), it must be material. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether or not to sell his stock. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Staffin v. Greenberg*, 672 F.2d 1196 (3d Cir.1982).

The Federal Securities Laws do not impose a duty on a corporation to disclose a material fact when it is not trading its own stock. *Staffin*, 672 F.2d at 1204. A corporation that chooses to issue a statement, however, must include every "material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. . . ." Rule 10b–5(2). Furthermore, there is a duty to correct a previously truthful statement that has become misleading. *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343 (E.D.Pa.1979). Because Heublein was not trading its own stock prior to the issuance of the July 14th statement, it had no duty of disclosure before that time. Any violation of the Federal Securities Laws by Heublein, therefore, arises out of the July 14th release and Heublein's failure to correct that release prior to July 28th.

The plaintiff suggests that Heublein was required to disclose the following "facts" in the July 14th release or in a subsequent amendatory disclosure: (1) the Reynolds/Heublein "negotiations" and their "agreement in principle;" (2) the progress of the General Cinema negotiations and General Cinema's "ultimatums," (3) the sale of General Cinema's Miami television station.

## THE REYNOLDS–HEUBLEIN DISCUSSIONS

As a matter of law, "preliminary merger discussions" are not material corporate developments, and thus need not be disclosed. A duty to disclose only arises when there is an "agreement in principle" to merge. *Staffin*, 672 F.2d at 1205–07. The reason for this rule is that the premature disclosure of such discussions may in itself be misleading, and do more harm than good to a corporation's shareholders. A premature disclosure of preliminary discussions is likely to cause the market price of the target company's stock to rise towards the expected tender price. Because a tender offer must usually be made at a premium above the market price, this rise in market price will push up the price that the acquiring party must offer in order to make the tender offer attractive to the shareholders. This may, in turn, cause the acquiring party to lose interest in the acquisition, causing those shareholders who had purchased shares at a rate inflated by the disclosure of merger discussions to suffer an economic loss when the price of the stock collapses to its pre-disclosure price. *See Staffin*, 672 F.2d at 1206–07. It is not difficult, in fact, to imagine such shareholders pursuing an action under Rule 10b–5 on the grounds that the disclosure of the preliminary merger discussions was materially misleading.

After an examination of the record, I conclude that Heublein was under no duty to disclose its discussions with Reynolds prior to July 28th. I reach this conclusion because there clearly was no "agreement in principle" to merge prior to that time.

It is undisputed that no agreement between Heublein and Reynolds on the price to be paid for Heublein shares was reached until 5:00 p.m. on July 27th. It is also clear that the parties reached an impasse over Reynolds' demand for withdrawal rights during the evening of July 27th. This impasse was not broken until the morning of July 29th, shortly before the merger agreement was submitted to the respective boards of directors for approval.

The plaintiff argues that there is a factual dispute as to when an agreement in principle was reached. I disagree. Even after making all reasonable inferences in favor of the plaintiff, it is clear that no "agreement in principle" to merge was formed during the July 9th and 15th meetings between Waldron, Watson and Sticht, or the meeting between the investment bankers that occurred on July 19th or 20th. At none of these meetings was price or the structure of the transaction discussed.

The plaintiff argues that the record supports an inference that Waldron and Watson were basically motivated by a desire to protect their own positions and financial well-being. Thus, he seems to argue, once Sticht made an acceptable proposal as to the future of Heublein's management team with Reynolds, an agreement in principle to merge existed. The plaintiff alleges that such a proposal was made by Sticht on July 9th, or, at least by July 15th. Assuming that the record would support such a finding as to the motivations of Heublein's top management, I still must conclude that there was no agreement in principle to merge prior to July 27th.

The record is clear that until Waldron called Sticht on July 23rd, Heublein's management had continually expressed their desire to preserve Heublein's independence. The continuing negotiations with Smith of General Cinema and Heublein's exploration of other responses to General Cinema's threat clearly evidence Heublein's commit-

ment to independence. Such a commitment is inconsistent with the existence of an agreement in principle to merge.

 While an "agreement in principle" may exist before all of the details of a merger have been negotiated, and before the merger is given final approval by the boards of the corporations to be merged, it is clear that agreement on the fundamental terms of the merger must be reached before the merger negotiations become a material corporate development that must be disclosed to the investing public. Without fundamental agreement on the price and structure of a merger, the merger is simply too tentative to give rise to a duty of disclosure. As pointed out in *Staffin*, the relationship between tender price and market price is critical in a tender offer. The disclosure of merger discussions before an agreement on price has been reached could certainly effect the market price of the stock. This, in turn, would have a great deal of impact on the tender price. As previously noted, this situation could lead to a collapse of the merger negotiations. Thus, such premature disclosure is not required by the Federal Securities Laws because it is likely to do more harm to investors than non-disclosure. I find, therefore, that Heublein was not required to make any statement concerning its discussions with Reynolds prior to the agreement between Sticht, Watson and Waldron to recommend a tender price of $60 per share to the respective Heublein and Reynolds boards. It is undisputed that this agreement was not reached until close to 5:00 p.m. on July 27th.[15]

## THE GENERAL CINEMA SITUATION

The plaintiff argues that in response to the New York Stock Exchange query of July 14, Heublein should have pointed to developments in the General Cinema situation as a possible explanation for the activity in Heublein stock on that day. The

---

**15.** I need not decide whether Heublein was required to disclose its discussions with Reynolds before trading resumed on July 28th because the plaintiff sold his stock on the afternoon of

July 27th. I note, however, that the dispute over withdrawal rights did pose a serious threat to the completion of the merger. This issue was not resolved until the morning of July 29th.

plaintiff further argues that Heublein, in order to fulfill its duty to correct the July 14th statement, should have disclosed the deterioration of its negotiations with General Cinema and the threat posed by the sale of General Cinema's Miami television station.

■ The record is clear that Heublein continued to negotiate with General Cinema until July 23rd. Until that time various possible resolutions of the General Cinema problem were being discussed by Waldron and Smith. While it is true that Waldron steadily became less hopeful about the possibility of negotiating with General Cinema, it was not until July 23rd that he abandoned the idea all together. Requiring disclosure of such tentative negotiations, before any sort of agreement was reached, would contradict the principal set forth in *Staffin*. As in the case of merger negotiations, premature disclosure of exploratory discussion to resolve a hostile takeover attempt could be self-defeating.

It is also clear that on July 14th, Heublein had no reason to believe that the increased trading in its stock was in any way related to General Cinema. Caspar and other Heublein executives clearly believed that General Cinema would not be able to resume its purchases of Heublein stock without amending its Schedule 13D statement. Furthermore, there were other rumors circulating at that time concerning a possible takeover bid against Heublein. One in particular concerned a bid by Nestle. Because Heublein was not the source of these rumors it would have been improper for it to have made any comment as to their veracity. The plaintiff, however, has pointed to nothing that could reasonably lead to the conclusion that Heublein connected the increased activity of July 14th to some aspect of the General Cinema takeover bid.

Finally, as to the Miami television station, all that Heublein knew was that Smith had called Waldron on July 14th and told him that General Cinema was about to make an announcement, but that the announcement should not upset Heublein. While Waldron expected that the announcement would concern the sale of General Cinema's Miami station, and while Waldron was not sanguine about the effect of such a sale on the General Cinema—Heublein situation, it is clear that any disclosure of Heublein's suspicions of General Cinema's intentions at that point would have had a great potential for misleading investors and disturbing the market. Such a disclosure, therefore, would have been unjustifiable.[16]

I find, therefore, that Heublein was under no duty to make any disclosure as to developments between itself and General Cinema during the period from July 14th to July 28th.

■ Because I find that Heublein was under no duty to disclose their negotiations with Reynolds or any developments pertaining to General Cinema prior to July 28, I will enter summary judgment in favor of Heublein on Count I of the complaint.[17]

COUNT II

■ In Count II of his complaint, the plaintiff alleges that Reynolds is guilty of aiding and abetting Heublein in Heublein's violations of the Federal Securities Laws. In order to prove this allegation the plaintiff must show, *inter alia*, that there was an underlying securities violation. *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Because no underlying securities violation has been committed by Heublein, the plaintiff will not be able to make out a case against Reynolds. Accordingly, I will grant summary judgment in favor of Reyn-

---

**16.** The actual agreement for sale of the station was not made until December, 1982.

**17.** Heublein has also argued that it is entitled to summary judgment because the plaintiff has not been able to produce any evidence that Heu-

blein acted with the requisite *scienter* to violate the Securities Laws. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Because of the conclusions reached above, I need not address this argument.

olds on Count II of the plaintiff's complaint.

## COUNTS III AND IV

 The plaintiff concedes that if his federal claims fail, this court will have no jurisdiction to hear the pendent state claims alleged in Counts III and IV. The plaintiff requests, however, that rather than dismissing these claims, I transfer the case to the Court of Common Pleas of Philadelphia County. The plaintiff cites *Weaver v. Marine Bank,* 683 F.2d 744 (3d Cir.1982) as authority to support this request. Because none of the equitable considerations that mandated transfer in *Weaver* appear to exist in this case, I will deny the plaintiff's request and dismiss Counts III and IV of the complaint.

Finally, the plaintiff has moved for leave to file an amended complaint. The proposed amendments are intended to reflect many of the facts developed during discovery relating to the present motion for summary judgment. Because I have considered these facts in deciding the summary judgment motion, and because I have found that the defendants are entitled to summary judgment, I see no purpose to be served by the filing of an amended complaint. The plaintiff's motion for leave will, therefore, be denied.